UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
.......................................................................................................x
EMILIO TATIS

                                                Docket No:

                                                    **COMPLAINT**

                    Plaintiff,

      -against-                               JURY DEMAND

THE CITY OF NEW YORK, NEW YORK CITY DISTRICT
ATTORNEYS OFFICE, CYRUS VANCE, JR., in his capacity as
District Attorney of the County of New York, STEVEN MORAN,
Individually

                                  Defendants.
.......................................................................................................x

       The plaintiff, EMILIO TATIS  (hereinafter "Plaintiff") by his attorney THE LAW OFFICE OF

JOHN A. SCOLA, PLLC., allege the following upon information and belief, against THE CITY OF

NEW YORK; NEW YORK CITY DISTRICT ATTORNEYS OFFICE, CYRUS VANCE JR. in his

capacity as District Attorney of the County of New York and STEVEN MORAN, Individually.

## NATURE OF THE ACTION

1.   This is an action for compensatory, emotional and punitive damages to redress the past and
future deprivation of rights secured to Plaintiff by Title VII of the Civil Rights Act of 1964
("Title VII"), as amended, 42 U.S.C. §§ 2000e, et seq., 42 U.S.C. §1981,  42 U.S.C. §1986, the
New York States Human Rights Law, New York Executive Law §§290 et seq.; New York City
Local Law 59 of 1986,  New York City Human Rights Law 8-107.

## JURISDICTION AND VENUE

2.   The jurisdiction of this Court is invoked pursuant to 42 U.S.C. §2000e-5(f)(3), 28 U.S.C. §§
1331 and 1343 (3), and 28 U.S.C. § 1367(a) for claims arising under the New York State Human
Rights Law and the New York City Human Rights Law based on the doctrine of supplemental

jurisdiction in that such claims arise from a common nucleus of operative fact, and are so intertwined with other matters pending before the Court as to make exercise of supplemental jurisdiction appropriate.

3. Venue is properly placed in the Southern District of New York under 28 U.S.C.§1391(b) and 42 U.S.C. 2000e-5(f)(3) in that the central offices of Defendants are within this district, a substantial part of the events giving rise to this claim arose in this district and records relevant to the practices complained of herein are located in this district.

4. Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under Title VII. Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") (Charge #: 520202004420) and was issued a right to sue letter on August 31, 2020.

5. This lawsuit is commenced within ninety (90) days of the receipt by Plaintiff of his notice of right to sue from the EEOC.

## **PARTIES**

6. Plaintiff Emilio Tatis is a Hispanic Male hired by the Defendant City of New York and New York County District Attorney's office on November 3, 2014 as a Digital Evidence Custodian within the Cybercrime and Identity Theft Bureau's High Technology Analysis Unit. Plaintiff was terminated from the New York District Attorney's Office on October 17, 2019.

7. Defendant City of New York ("NYC" or "City") is and was at all times relevant hereto a municipal corporation duly organized and existing under the laws of the State of New York exercising governmental authority, Defendant is an employer as defined by Title VII and is an employer subject to the New York State Human Rights Law and New York City Local Law , Defendant City of New York is a "person" for purposes of §§ 1981, 1983,

2

1985 and the Fourteenth Amendment of the U.S. Constitution. Defendant City of New York was or is the employer of Plaintiff and other named Defendants herein.

8. Defendant New York County District Attorney's Office (hereinafter "NYCDA"), was and is a department, agency, bureau and/or subdivision of the Defendant City. Defendant NYCDA is and was at all times relevant hereto, a local government agency of New York City and was or is the employer of all the individual Plaintiffs and Defendants herein.

9. Defendant CYRUS VANCE JR. (hereinafter referred to as "VANCE") has been District Attorney of NYCDA from January 2010 to the present, is an employee of Defendant City, and is the principal administrator of Defendant NYCDA. He is responsible for the institution and application of the NYCDA's employment policies, including its internal investigatory and disciplinary process. He is also responsible for ensuring that the employees of the NYCDA do not deprive anyone of their rights secured by the Constitution and laws of the United States as well as the Constitution and laws of the State and City of New York. He is the final authority in all disciplinary matters and employment decisions. This Defendant knew or should have known of the discriminatory customs, practices, policies and wrongful acts of the Defendants described in this Complaint and condoned, ratified and/or authorized such conduct.

10. Defendant STEVEN MORAN, was Plaintiff's direct supervisor in the NYCDA who repeatedly referred to Plaintiff as a "Monkey" and was ultimately responsible for his termination following Plaintiff's complaints of discrimination against MORAN.

## ALLEGATIONS OF FACT

11. On November 3, 2014, Plaintiff began to work at the New York City District Attorney's Office as a Digital Evidence Custodian for the New York County District Attorney's Office within the Cybercrime and Identity Theft Bureau's High Technology Analysis

Unit.

12. Within Plaintiff's first year as a Digital Evidence Custodian, Plaintiff was able to complete his duties and responsibilities while also assisting the Unit's Computer Forensic Analysts with their casework.

13. The unit consisted of one Dominican person (Plaintiff), five white employees and one Asian employee.

14. At all times herein, similarly situated white employees is a reference to the five (5) white employees who worked in Plaintiff's unit.

15. The unit's analysts consisted of one Dominican person (Plaintiff), four white employees and two Asian employees.

16. This successful apprenticeship experience led to a promotion as a Computer Forensic Analyst just a year shy after Plaintiff began his employment at the Office.

17. As a result, Plaintiff was the first person to transcend the Digital Evidence Custodian role, and first Hispanic to become a Computer Forensic Analyst.

18. The Defendants had four white employees and two Asian employees in these roles.

19. Despite being more qualified, Plaintiff was not immediately placed in this higher analyst role.

20. On November 3, 2015, Plaintiff replaced a Senior Computer Forensic Analyst at an Incident Response overview seminar who could not attend the training.

21. Upon Plaintiff's arrival from training, he briefed the Unit's Deputy Directory David Chan (hereinafter "Chan") of what Plaintiff had learned and advised him on the resources needed to improve the Unit's ability to conduct Incident Response investigation.

22. Although Chan agreed on the importance of conducting this more advance form of

4

computer forensic investigation, there was no allocation for it on the Unit's budget at the time.

23. Chan did advise Plaintiff to independently work on building his incident response skills and take on cases which may include incident response elements.

24. Chan assured that in doing this work, Plaintiff would be able to demonstrate its value and consequently have the initiative funded.

25. Plaintiff took the advice of Chan and began this venture to improve the unit's forensic investigation at the New York County District Attorney's Office.

26. This meant all matters of consultation, advisement, direct assistance in a search warrant, and forensic analysis for incident response related investigations were directed towards Plaintiff by the Unit.

27. Plaintiff's white and Asian colleagues were regularly given training and sent to conferences to improve their skills to excel within the NYCDA.

28. Plaintiff, who was more qualified and talented, was not given these same opportunities which stunted his upward mobility at the NYCDA.

29. Starting in 2016, Plaintiff began realizing that his white colleagues were not being promoted in accordance with the policies of the NYCDA.

30. These white and Asian colleagues would regularly skip steps in promotions in a way that Plaintiff was not able.

31. More specifically Boris Vestfrid, white male, skipped from his role as a 2.2 to a title 3, skipping the 2.3 position altogether.

32. Laurence Hayes, white male, skipped a step and was given a raise six months after Vestfrid.

33. Other people such as Nathan Webber also skipped steps and received raises.

34. Plaintiff was similarly situated and more competent to these white employees yet was passed over for promotion.

35. On April 2, 2017, after more than a year and a half of requesting resources and trainings to address incident response cases while independently self-training, Plaintiff was able to attend Memory Forensics training.

36. In 2016, Plaintiff successfully completed his masters from John Jay in Digital Forensics and Cyber Security.

37. Plaintiff was significantly more trained than his colleague yet did not receive the same opportunities as his white colleagues.

38. Also, in 2016, Moran first referred to Plaintiff and his Guyanese colleague, Ryan Lawrence, as monkeys in a racially derogatory way.

39. On November 3, 2017, Plaintiff met with Chan and Unit's Director Steven Moran (hereinafter referred to as "Moran") for his yearly evaluation.

40. At this meeting and prior, Plaintiff spoke to management about not being promoted and about being discriminated against because Plaintiff had noticed that only White employees were being promoted.

41. Management responded in coded language to Plaintiff that he needed to work harder.

42. This excuse was pretextual for discrimination as Plaintiff worked just as hard as his white colleagues who were promoted.

43. Further, similarly situated white employees were regularly allowed to attend trainings, received promotions not based on merit and receive other employment opportunities that Plaintiff and other minority employees were not given.

44. In that time, Plaintiff only received one requested training, while continuously taking on more incident response related matters without assistance or resources, unlike his white peers.

45. Plaintiff's performance was not aided in the same manner as his similarly situated white colleagues.

46. Plaintiff conveyed the aforementioned to supervisors at this meeting.

47. Upon reflecting on the matter, both supervisors saw merit in this assessment and communicated this to Plaintiff.

48. Moran acknowledge that he underestimated Plaintiff's aptitude when not initially hiring Plaintiff as a computer forensic analyst and stated that he "owed me (Plaintiff) one".

49. Moran regarded Plaintiff as less qualified and thus gave him the lower-level position because of his race.

50. Moran stated that this mistake would be rectified the following year, as Plaintiff would be promoted to Senior Forensic Analyst (salary $75,000).

51. Even with this promotion, Plaintiff would only be elevated to receive the same rate of compensation as other white analysts were already earning who had worked on independent initiatives.

52. Additionally, Moran and Chan agreed that if Plaintiff was able to document and provide a portfolio detailing the contribution to the Office of his incident response work by June/July of the following year, they would rebrand the Computer Forensic Analyst position to a new position called "Malware Analyst" to provide the resources need to continue addressing incident response cases.

53. Plaintiff would then be given the Malware Analyst position.

54. On August 15, 2018, after reviewing all the provided documentation and portfolio detailing Plaintiff's contribution since his performance review, Plaintiff along with Moran met with District Attorney of New York County Cyrus Vance Jr and his executive staff.

55. At this meeting Moran conveyed the importance of creating a Cyber Response Taskforce to address the city's incident response needs where he utilized Plaintiff's work as proof of concept.

56. Plaintiff's portfolio consisted of all of the written code that he had developed, high level forensics, programs to analyze malware which Plaintiff had developed, and dynamic applications to analyze evidence.

57. The NYCDA prior to Plaintiff, had ignored a glaring hole in their ability to analyze malware, volatile memory, and other electronic evidence.

58. Their procedures were antiquated and paled in comparison to federal forensics.

59. Moran, using Plaintiff's portfolio, was able to obtain VANCE's consent to initiate a Cyber Response Taskforce.

60. On September 15, 2018, Plaintiff met with Cybercrime and Identity Theft Bureau Chief Elizabeth Roper (hereinafter referred to as "Roper") to discuss a scheduled training, the proposed Malware Analysts job description and compensation, as well as the creation of the Cyber Response Taskforce.

61. Roper informed Plaintiff that he would become a Malware Analyst with a salary of $75,000.

62. Additionally, Roper wanted Plaintiff to be part of the Cyber Response Taskforce.

63. Plaintiff was aware that this salary offer was significantly less than other similarly situated

White and Asian employees who held similar roles.

64. These employees, who shared similar roles to Plaintiff had a salary of above $90,000.

65. Plaintiff was more qualified than these analysts and were similarly situated but for their race.

66. At this point Plaintiff informed Roper that if Plaintiff took part in this taskforce, it could not be at the same rate that Moran had agreed to the year prior, as he would be required to do substantially more work.

67. Plaintiff informed Roper that the salary suggested by Moran a year prior to this new role being created, was the rate "owed" for Plaintiff continuous work, and it did not incur the duties and responsibilities of working in a taskforce.

68. Plaintiff stated that it would be in his best interests to not accept a position with more work and less pay.

69. Plaintiff's statements infuriated Roper and she immediately proceeded to terminate Plaintiff's promotion and cancel his schedule training.

70. On October 12, 2018, after meeting with Chan in the morning, where Plaintiff was informed that his employment was in jeopardy for upsetting those on top of the chain of command by his decision.

71. Plaintiff next met with Moran who wanted to discuss the conversation Plaintiff had with. Roper.

72. In this meeting Moran informed Plaintiff that he should have approached him like a man first before speaking with Roper as Plaintiff had upset a lot of people (those on top of the chain of command) with his decision.

73. Additionally, Moran asserted that it was in Plaintiff's best interest to accept the offer

provided, even though the job description was amorphous, and compensation was equally unclear.

74. On or about November or December of 2018, Plaintiff was called a "Monkey" by Moran which was not the first time that he had done that.

75. Moran had referred to Plaintiff as a "Monkey" on multiple occasions in the past which made Plaintiff uncomfortable as a result of the clearly derogatory connotation surrounding the word monkey.

76. At this time, Plaintiff was one of three employees who was of color and Plaintiff felt that he took advantage of that and used that word against Plaintiff to be able to minimize him and his work.

77. After Moran again called Plaintiff a 'Monkey', Plaintiff did not immediately react because Plaintiff did not know how to react.

78. Plaintiff had a conversation with his minority co-worker about what Moran had said.

79. During that time, Plaintiff did not want to cause a stir since there were already several things going on in his employment that might've had affected him negatively.

80. Plaintiff did not file a complaint of discrimination at this time yet it was clear that discriminatory animus was behind the actions of Moran.

81. On December 6, 2018, Chan announces the creation of the Cyber Response Unit a sub-unit of the Computer Forensic Unit and begins shifting casework accordingly.

82. On February 20, 2019, unbeknownst to Plaintiff, he officially became a Cyber Response Investigator (salary $76,202), nearly $15,000 less than similarly situated white employees.

83. Plaintiff was never presented with a completed job description or compensation agreement, as he had been in the past and was on September 15, 2018.

10

84. On March 28, 2019, Plaintiff was still reaching out to Moran for any updates/ information regarding the salary or salary structure of the Cyber Response Investigator position yet received no response.

85. Since Plaintiff was essentially the only employee capable of this higher level work all projects fell to him.

86. This resulted in Plaintiff working significant overtime to try to handle the increased work load.

87. On April 16, 2019, Plaintiff asked his direct supervisor, under the Cyber Response Unit, Laurence Hayes for time off, which he agreed to.

88. Hayes does not have a computer background yet was placed in charge of Plaintiff and the Cyber Response Unit causing Plaintiff to have to do the entirety of the work in the Unit.

89. At around 3:40 pm that day, Plaintiff read and responded to an email from Moran, which CC'd Hayes, regarding the reason for the time-off request.

90. As Plaintiff just completed his workday and was getting out of the Office, Plaintiff provided a quick reply.

91. Moran did not receive this response well, as this reply began a long series of back and forth emails where Plaintiff had to justify his reasons for requesting the time off, even though Plaintiff provided the same rational as other employees.

92. White colleagues were not subject to these types of inquiries when requesting time off.

93. At 10:00 pm, Moran called Plaintiff's personal phone to continue the discussion.

94. At this time, Plaintiff had already fallen asleep and missed the call.

95. The next day Plaintiff woke up to a series of emails from Moran telling him to give Moran a call or report to work the following day.

96. Plaintiff opted to report to work the next morning as it appeared that Moran had a lot personal issues with him which was best dealt with in person.

97. On April 18, 2019, Plaintiff attended a meeting with Moran and Hayes to discuss the conversation that transpired through email.

98. From the very beginning of the meeting, Moran insisted on knowing why Plaintiff had requested time-off, which Plaintiff emphasized as being a personal matter.

99. At this point, Moran was visibly irritated and informed Plaintiff that he was going to be reported to HR for insubordination and would spend the day conducting administrative work.

100. Moran concluded the meeting by requesting an apology for the way Plaintiff responded to him, as well as stating that "If Plaintiff would have called him and handled this like a man" none of this would have happened.

101. These remarks left Plaintiff feeling extremely offended and personally attacked by Moran.

102. Furthermore, after the meeting Moran emailed Plaintiff information regarding mental health services, to mock and humiliate him by inferring that Plaintiff suffered or was suffering from a mental health issue.

103. If Moran's concerns of Plaintiff's mental health were reasonable he would not have threatened him for being insubordinate.

104. Immediately following this meeting, Moran began harassing Plaintiff on a daily basis where he required Plaintiff, and only Plaintiff to have a daily meeting with him.

105. Moran continued treating Plaintiff differently than similarly situated white employees.

106.    In mid/end April of 2019 Plaintiff contacted his union and they advised him to file a complaint of discrimination with the Office of Equal Employment complaint with them.

107.    Plaintiff filed a complaint the following day alleging, gender, national origin and race discrimination.

108.    On May 17, 2019, after continuous daily scrutiny from Moran, Plaintiff met with him to discuss Plaintiff's exact duties and responsibilities per the job description previously submitted to Human Resources.

109.    Plaintiff was purposefully never given a copy of the job description as his actual tasks greatly superseded the job description.

110.    Further, Plaintiff met with Moran to discuss the support that Plaintiff would receive from management related to the newly formed task force.

111.    Plaintiff was particularly interested in learning about managements availability for querying and assistance as Plaintiff was assigned to a two-person unit where Hayes would supervise Plaintiff.

112.    Despite supervising the unit, Hayes had very little technical aptitude and whose random availability led to an unsupportive work environment for Plaintiff, which he looked to address in the meeting.

113.    At this meeting, upon questioning, Moran became irate with Plaintiff.

114.    Moran began to curse and scold Plaintiff, stating "if you want my fucking schedule, I will give you my fucking schedule" and "pretty soon you will have issues with me."

115.    Furthermore, Moran continued to express his impatience and stated that he, as management, could come into work whenever he pleases.

116.    On June 18, 2019, Plaintiff met with Executive Assistant District Attorney, Strategic

Initiative and EEO Office Nitin Savur, and Special Advisor to the District Attorney on Lesbian, Gay, Bisexual, and Transgender Issues Katie Doran, along with his union representative to resolve the matter detailed in the grievance complaint form issued by his Union, for the aforementioned issues.

117.    At this meeting, Plaintiff gave a detailed statement regarding the unfair treatment administered to Plaintiff by the Cybercrime and Identity Theft Bureau's higher ranks, and more specifically, Moran.

118.    This meeting concluded with Savur reassuring Plaintiff that a thorough investigation would take place to resolve this matter.

119.    On July 10, 2019, Plaintiff met with Savur, Ms. Doran, and his union representative Isaac Harry, to discuss the findings of Savur's investigation.

120.    At the beginning of this meeting, Plaintiff noticed a plague in Savur's office commemorating his time in the Cybercrime and Identity Theft Bureau.

121.    Savur did not disclose this conflict until he was asked specifically by Plaintiff.

122.    Following Plaintiff's inquiry he was informed that Savur and Moran had a previous relationship wherein they worked together in the Cybercrime and Identity Theft Bureau.

123.    In fact, Savur had supervised Moran while serving as the Deputy Chief of the Cybercrime and Identity Theft Unit.

124.    According to Savur, there were no EEO violations committed by the Cybercrime and Identity Theft Bureau's higher ranks, and more specifically, Moran.

125.    This decision was reached despite Moran admitting to referring to Plaintiff as a monkey, not acting as a man, and denying him training for more than two years.

126.    Savur rationalized Moran's actions as just a simple misunderstanding.

127.    More specifically, regarding not acting like a man, Mr. Savur deduced that since he did not find that Plaintiff was explicitly singled out due to his perceived gender and others were treated more favorably due to theirs, no gender discrimination was committed.

128.    Savur completely ignored the fact that after Mr. Moran's sexist comments were made and that Plaintiff had been immediately punished, threatened, and ostracized when Moran shared their email exchange with other Cybercrime and Identity Theft Bureau supervisors.

129.    In referring to Plaintiff as a monkey, Savur stated that Moran was only referring to Plaintiff and other subordinates as "Cyber Monkeys," a term he indicates refers to a technological simpleton.

130.    To this effect, Plaintiff made it clear that in the collective years in computers that he had spent since undergraduate, graduate, and professional,  he had never heard the term or used the word.

131.    Furthermore, Moran's use of the name never included the prefix cyber.

132.    Savur found that no EEO violations were committed even though he, Doran, and Moran agreed that the term is insensitive and unprofessional.

133.    Lastly, regarding the denial of training for more than two years, Savur determined that this was due to the Bureau's budget, as well as no one else has gone to training that Plaintiff specified, which are reserved for those employees Moran deems eligible to go.

134.    Savur ignores the fact that Plaintiff's latest training was canceled just three days before he was scheduled to attend by Cybercrime and Identity Theft Bureau Chief Elizabeth Roper because he did not accept a new employment offer which description and salary were not in his best interest.

15

135.    Savur also overlooked the fact that Plaintiff was currently working in a 10-million-dollar lab that utilizes software that costs hundreds of thousands of dollars, where all of his peers have received numerous training while he had not, and additionally they have gone to specialized training unique to their aptitudes, not the job description.

136.    Savur concluded the meeting by justifying management's (Moran's) scrutiny by stating that "they (management) have higher expectation of you, and it may be because you're at a higher level than the other people (analysts) that you are comparing yourself."

137.    Savur failed to address why Plaintiff was not supported in the same manner as these analysts when his aptitude as Moran stated was at a higher level.

138.    On July 25, 2019, Plaintiff met for the second time with George Argyros, the Director of Human Resources for the New York County District Attorney's Office.

139.    At the first meeting, June 28, 2019, they had discussed the events which led to the EEO complaint.

140.    This meeting was a follow-up on July 25, at which point in time Argyros had conversed with all parties involved.

141.    Argyros determined that mandatory daily meetings with Moran were unwarranted and excessive.

142.    Consequently, he advised Moran to limit these meetings.

143.    On August 5, 2019, Plaintiff met with  Chan, Moran, and Roper to receive his 2018 performance evaluation.

144.    This evaluation concluded that Plaintiff's performance met expectation.

145.    On August 7, 2019, The New York County District Attorney's Office releases a press announcement pertaining to a case which Plaintiff worked on for multiple years, traveled the country, and collaborated with multiple law enforcement agencies to provide

the forensic evidence needed.

146.   However, Plaintiff's name was omitted from the press release which was abnormal, and Plaintiff did not receive any recognition for my work.

147.   Plaintiff contacted the lead Assistant District Attorney (ADA) on the case to inquire about the omission.

148.   The ADA informed Plaintiff that his name was not mentioned in the press release per Moran's request.

149.   On mid/end of August 2019, Plaintiff contacted the unit's lead digital evidence custodian Joseph Stern regarding his casework.

150.   Plaintiff had noticed that most of his activity at the Office had been reduced to conducting miscellaneous research tasks for Moran.

151.   Since reporting to Moran, Plaintiff received almost no new cases.

152.   The new cases Plaintiff had begun working on, were those where the lead ADA personally requested his unique skill set.

153.   Plaintiff asked Stern (who scheduled and assigned analysts cases) why he was not being assigned new cases, and why evidence of the cases he was assigned to were given to other analysts.

154.   Stern told Plaintiff that these changes were per Moran's orders.

155.   It became clear to Plaintiff at this point that Moran was attempting to push him out of the District Attorney's office.

156.   On mid/end of September 2019, Plaintiff reached out to Savur to receive a copy of any documentation or reports pertaining to his case.

157.   Savur informed Plaintiff that he could not provide him with this documentation.

17

158. On October 15, 2019, Plaintiff testified in criminal court per Moran's discretion, who still found him fit in a professional capacity to testify for an ongoing investigation

159. On October 17, 2019, less than a month after Plaintiff inquired about the status of his discrimination complaint Plaintiff was terminated from the New York District Attorney's Office.

160. Plaintiff was told of his termination, and he also received a termination letter, which stated that "Effective immediately, your services as a Community Associate in the New York County District Attorney's Office are no longer required."

161. Plaintiff was terminated without due process and on the day of his termination, someone from Human Resources came in and told Plaintiff he was terminated and escorted him out of the building.

162. While Plaintiff was walking out, Plaintiff asked the Human Resource representative, what was the reason for his termination, and he said, 'because the Director decided that'.

163. The director was Steven Moran.

164. Plaintiff was terminated unlawfully, and in retaliation of claims of discrimination which he alleged from 2017 through his termination date.

165. This is most evidenced by the temporal proximity of the inquiry into his discrimination complaint to Plaintiff's termination less than a month later.

166. On November 22, 2019, The New York County District Attorney's Office Cybercrime and Identity Theft Bureau releases a job posting requesting the same services Plaintiff had provided.

## COUNT I
## DISCRIMINATION
## IN VIOLATION OF
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

167.     Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

168.     Plaintiff alleges that Title VII of the Civil Rights Act of 1964 makes it unlawful to discriminate or retaliate against an individual on the basis of their race, national origin and color in violation of 42 U.S.C. §§2000e et seq.

169.     Plaintiff suffered adverse employment actions on the basis of his race and national origin based on the disparate application of opportunities during his employment and subsequent termination.

170.     Defendants implementation of terms and conditions of employment, including the disparate treatment and pay of Plaintiff and termination violates 42 U.S.C. §2000e-3(a) which makes it unlawful for an employer to discriminate and/or retaliate against any of its employees for opposing unlawful employment practices or filing complaints of discrimination.

171.     Plaintiff has satisfied the procedural requirements of Title VII as a condition of filling this action, in particular, Plaintiff filed a timely charge with the EEOC and filed the complaint within ninety (90) days from receipt of the notice of right to sue on which this lawsuit is based.

172.     Plaintiff has suffered and will continue to suffer irreparable injury caused by Defendants' illegal conduct including interference with his civil rights, right to speak out against discrimination and to and to be free of such discrimination based upon race, color, and national origin.

173.     As a direct and proximate result of Defendants unlawful acts, Plaintiff continues to

suffer loss of employment, loss of income, loss of other employment benefits including, and have suffered and continue to suffer distress, humiliation, great expense, embarrassment, and damage to their reputations.

174.     As a result of the forgoing, Plaintiff is entitled to compensatory damages pursuant to Title VII in an amount to be determined at trial.

**COUNT II**
**RETALIATION**
**IN VIOLATION OF**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

175.     Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

176.     Plaintiff alleges that Title VII of the Civil Rights Act of 1964 makes it unlawful to discriminate or retaliate against an individual on the basis of their race, national origin and color in violation of 42 U.S.C. §§2000e et seq.

177.     Defendants subjected Plaintiff to retaliation for his lawful complaints of discrimination based on his race, national origin and sex.

178.     Plaintiff suffered adverse employment actions in retaliation for these complaints.

179.     Defendants implementation of terms and conditions of employment, including the disparate disciplinary treatment of Plaintiff in retaliation for his complaints of discrimination, violates 42 U.S.C. §2000e-3(a) which makes it unlawful for an employer to discriminate and/or retaliate against any of its employees for opposing unlawful employment practices or filing complaints of discrimination.

180.     Plaintiff has satisfied the procedural requirements of Title VII as a condition of filling this action, in particular, Plaintiff filed a timely charge with the EEOC and filed the complaint within ninety (90) days from receipt of the notice of right to sue on which this lawsuit is based.

181.     Plaintiff has suffered and will continue to suffer irreparable injury caused by Defendants' illegal conduct including interference with his civil rights, right to speak out against discrimination and to and to be free of such discrimination based upon race, color, and national origin.

182.     As a direct and proximate result of Defendants unlawful acts, Plaintiffs and has suffered and continue to suffer loss of employment, loss of income, loss of other employment benefits including, and have suffered and continue to suffer distress, humiliation, great expense, embarrassment, and damage to their reputations.

183.     As a result of the forgoing, Plaintiff is entitled to compensatory damages pursuant to Title VII in an amount to be determined at trial.

### COUNT III
### (42 U.S.C. § 1981)

184.     Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

185.     This claim is brought under 42 U.S.C. §1981. Section 1981 provides in pertinent part that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

186.     A contract of employment exists and existed between Plaintiff and Defendant CITY OF NEW YORK and NYCDA in that the Defendants' and Plaintiff agreed that Plaintiff would be hired to work for it in a specific position described in the Complaint, at a specific average rate, for an indefinite period of time.

187.     Defendants denied Plaintiff his ability to earn his full pension as a result of his race, color and national origin.

188.     Defendants' actions as hereinbefore set forth also prevented Plaintiff from enjoying

and enforcing his employment contract rights on the same basis as white persons, thereby denying said rights in violation of the Civil Rights Act of 1866, 42 U.S.C. Section 1981, as amended.

189.     Defendants' actions had both the intention and the effect of depriving Plaintiff of the rights and benefits of his contractual relationship with the Department on the basis of their race, color and national origin.

190.     As a direct and proximate result of Defendants unlawful acts, Plaintiff has suffered and continues to suffer loss of employment, loss of pension benefits, loss of variable supplement, loss of income, loss of other employment benefits, and have suffered and continues to suffer distress, humiliation, great expense, embarrassment and damage to their reputation.

191.     Plaintiff has suffered and will continue to suffer irreparable injury caused by Defendants' illegal conduct including interference with his civil rights, his rights to speak out against discrimination and to be free of such discrimination based upon race, color and national origin.

192.     The actions of Defendants, in depriving Plaintiffs of their constitutional and Civil Rights, as hereinbefore stated, were willful and malicious. As a result of Defendants' reckless and intentional acts, Plaintiff and members of their class are entitled to compensatory damages and punitive damages in an amount to be determined at trial.

193.     Based on the foregoing, Plaintiff are entitled to compensatory and punitive damages against all individual Defendants in a sum to be determined at trial.

## COUNT IV
### (42 U.S.C. §§ 1985 and 1986)

194.     Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

195.     Upon information and belief, Defendants have and continue to conspire with and

22

amongst each Plaintiff the rights, privileges and immunities, and the equal protection of the laws to which they are entitled under the Constitution and laws of the United States in violation of 42 U.S.C. §1985.

196.    As a direct result of this conspiracy, the Defendants injured Plaintiff and deprived him of having and exercising their rights and privileges under the Constitution and laws of the United States.

197.    The actions and omissions of Defendants described herein were willful and malicious and based upon invidious racial and class based animus. The purpose of the aforementioned conspiracy was to violate the constitutional rights of the Plaintiff and as such violated 42 U.S.C. § 1985.

198.    All of the individual Defendants, as public officials, had notice of the conspiracy set forth above, in violation of section 1985 and failed and refused to prevent, prohibit and ameliorate the aforementioned conspiracies notwithstanding their abilities to do so. Said failure and/or refusal to prevent, prohibit and/or ameliorate constituted a violation of 42 U.S.C . § 1986.

199.    The actions of Defendants, in depriving Plaintiff of his constitutional and Civil Rights, as hereinbefore stated, were willful and malicious. As a result of Defendants' reckless and intentional acts, Plaintiff is entitled to compensatory damages and punitive damages in an amount to be determined at trial.

<u>**COUNT V**</u>
**RACE, ETHNICITY AND NATIONAL ORIGIN DISCRIMINATION AND HOSTILE
<u>WORK ENVIRONMENT IN VIOLATION OF NYSHRL</u>**

200.    Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

201.    Plaintiff alleges that New York State Executive Law §296, prohibits discrimination, harassment, and disparate treatment on the basis of race and national origin

in employment.

202.    Plaintiff performed his job duties satisfactorily which is reflected in Plaintiff's stellar performance evaluations. Nevertheless, Defendant denied Plaintiff benefits of employment, including all favorable conditions and emoluments thereof because of Plaintiff's race and national origin, created a hostile work environment by the conduct of Defendant CITY OF NEW YORK and without any non-discriminatory basis thereof. The wrongful conduct was condoned by the Defendant CITY OF NEW YORK.

203.    Defendant's actions were taken under circumstances giving rise to an inference of discrimination.

204.    Defendant subjected Plaintiff to a materially adverse and hostile work environment by subjecting him to ridicule, without supervisory intervention to discrimination and retaliation based on his race.

205.    The actions of the Defendant towards Plaintiff were severe and pervasive.

206.    The direct and proximate cause of Defendant's recklessness and negligence, Plaintiff lost his job, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt his credit rating, lost career and business opportunities, suffered severe damage to his good name and reputation, and endured severe emotional pain and trauma, all to his detriment.

207.    Plaintiff alleges Defendants, engaged in various unlawful employment actions against Plaintiff based on his race and national origin.

208.    Plaintiff alleges that as a direct and proximate result of the unlawful employment practices including a subjecting Plaintiff to a hostile work environment, of defendant CITY OF NEW YORK and NEW YORK CITY DISTRICT ATTORNEY'S OFFICE, Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, attorneys' fees, emotional distress, and damage to his personal and professional reputation

in an amount to be determined at trial.

## COUNT VI
## RETALIATION
## IN VIOLATION OF NEW YORK
## STATE EXECUTIVE LAW § 296

209.     Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

210.     Plaintiff alleges that New York State Executive Law §296, makes it unlawful to deny employment and benefits therein in retaliation for Plaintiff engaging in lawfully protected activity.

211.     Plaintiff engaged in protected activity when he complained of race, national origin and sex discrimination.

212.     Plaintiff was retaliated against by the Defendants as a result of his engagement in protected activity.

213.     Defendant's actions were taken under circumstances giving rise to an inference of retaliation.

214.     The direct and proximate cause of Defendants' recklessness and negligence, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt his credit rating, lost career and business opportunities, suffered severe damage to his good name and reputation, and endured severe emotional pain and trauma, all to his detriment.

215.     Plaintiff alleges Defendants engaged in various unlawful employment actions against Plaintiff in retaliation for Plaintiff's lawfully protected complaints.

216.     Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of Defendants, Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, attorneys' fees,  emotional distress, and damage to his personal

and professional reputation in an amount to be determined at trial.

### COUNT VII
### STRICT LIABILITY FOR RACE, ETHNICITY AND NATIONAL ORIGIN DISCRIMINATION AND HOSILE WORK ENVIRONMENT IN VIOLATION OF NYCHRL § 8-107 (13) (b)

217.    Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

218.    Plaintiff alleges that New York City Administrative Code § 8-107 (13) (b), makes a Defendant strictly liable for the acts of managers and supervisors against a subordinate employee, such as the Plaintiff herein.

219.    Plaintiff was subjected to repeated racial discrimination as a result of Plaintiff's race and national origin.

220.    The Defendant was aware of the actions of managers and supervisors but failed to take corrective remedial action which forced Plaintiff to be subjected to future race and national origin discrimination.

221.    The Defendant failed to exercise reasonable diligence to prevent such racially discriminatory conduct.

222.    Plaintiff performed his job duties satisfactorily which is reflected in Plaintiff's stellar performance evaluations. Nevertheless, Defendant denied Plaintiff benefits of employment, including all favorable conditions and emoluments thereof because of Plaintiff's race and national origin, created a hostile work environment by the conduct of the Defendants herein without any non-discriminatory basis thereof. The wrongful conduct was condoned by the Defendants.

223.    Defendants' actions were taken under circumstances giving rise to an inference of discrimination.

224.    The direct and proximate cause of Defendant's recklessness and negligence,

Plaintiff lost his job, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt his credit rating, lost career and business opportunities, suffered severe damage to his good name and reputation, and endured severe emotional pain and trauma, all to his detriment.

225.    Plaintiff alleges Defendants engaged in various unlawful employment actions against Plaintiff based on Plaintiff's race and national origin.

226.    Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of Defendants Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees,  emotional distress, and damage to his personal and professional reputation in an amount to be determined at trial.

227.    As a result of Defendants' willful actions they are strictly liable to Plaintiff for their actions.

### COUNT VIII
### RETALIATION
### STRICT LIABILITY IN VIOLATION OF
### NEW YORK CITY ADMINISTRATIVE CODE § 8-107(13)(b)

228.    Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

229.    Plaintiff alleges that New York City Administrative Code § 8-107 (13) (b), makes a Defendant strictly liable for the acts of managers and supervisors against a subordinate employee, such as the Plaintiff herein.

230.    Plaintiff was subjected to repeated retaliatory acts following the lawful complaints made by Plaintiff regarding race and national origin discrimination.

231.    The Defendants were aware of the actions of managers and supervisors but failed to take corrective remedial action which forced Plaintiff to be subjected to future retaliation.

232.     The Defendant failed to exercise reasonable diligence to prevent such retaliatory conduct.

233.     Plaintiff performed his job duties satisfactorily which is reflected in Plaintiff's stellar performance evaluations. Nevertheless, Defendants denied Plaintiff benefits of employment, including all favorable conditions and emoluments thereof because of Plaintiff's race and national origin, created a hostile work environment by the conduct of Defendants without any non-discriminatory basis thereof. The wrongful conduct was condoned by the Defendants.

234.     Defendant's actions were taken under circumstances giving rise to an inference of retaliation.

235.     The direct and proximate cause of Defendants' recklessness and negligence, Plaintiff lost his job, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt his credit rating, lost career and business opportunities, suffered severe damage to his good name and reputation, and endured severe emotional pain and trauma, all to his detriment.

236.     Plaintiff alleges Defendants engaged in various unlawful employment actions against Plaintiff in retaliation for his lawfully protected complaints of race and national origin discrimination.

237.     Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of Defendants Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees,  emotional distress, and damage to his personal and professional reputation in an amount to be determined at trial.

238.     As a result of Defendant's willful actions they are strictly liable to Plaintiff for their actions.

**COUNT IX**

## RACE, ETHNICITY AND NATIONAL ORIGIN DISCRIMINATION AND HOSTILE WORK ENVIRONMENT IN VIOLATION OF NYCHRL

239.     Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

240.     Plaintiff alleges that New York City Administrative Code § 8-107, makes it unlawful to deny employment on the basis of his race or national origin.

241.     Plaintiff performed his job duties satisfactorily which is reflected in Plaintiffs stellar performance evaluations. Nevertheless, Defendant denied Plaintiff benefits of employment, including all favorable conditions and emoluments thereof because of Plaintiff's race, created a hostile work environment by the conduct of Defendants. The wrongful conduct was condoned by the Defendants.

242.     Defendant's actions were taken under circumstances giving rise to an inference of discrimination.

243.     The direct and proximate cause of Defendant's recklessness and negligence, Plaintiff lost his job, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt his credit rating, lost career and business opportunities, suffered severe damage to his good name and reputation, and endured severe emotional pain and trauma, all to his detriment.

244.     Plaintiff alleges Defendants engaged in various unlawful employment actions against Plaintiff based on his race.

245.     Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of Defendants, Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees, emotional distress, and damage to his personal and professional reputation in an amount to be determined at trial.

## COUNT X
## RETALIATION

## IN VIOLATION OF NEW YORK CITY
## ADMINISTRATIVE CODE § 8-107

246.     Plaintiff re-alleges all paragraphs to this complaint and incorporates them by reference as fully set forth herein.

247.     Plaintiff alleges that New York City Administrative Code § 8-107, makes it unlawful to deny employment in retaliation for Plaintiff engaging in protected activity.

248.     Plaintiff engaged in protected activity when she complained of race and national origin discrimination.

249.     Plaintiff was retaliated against by the Defendants, as a result of his engagement in protected activity.

250.     Defendant's actions were taken under circumstances giving rise to an inference of retaliation.

251.     The direct and proximate cause of Defendant's recklessness and negligence, suffered lost past and future wages, lost other valuable benefits and emoluments of employment, hurt his credit rating, lost career and business opportunities, suffered severe damage to his good name and reputation, and endured severe emotional pain and trauma, all to his detriment.

252.     Plaintiff alleges Defendants engaged in various unlawful employment actions against Plaintiff in retaliation for Plaintiff's lawfully protected complaints.

253.     Plaintiff alleges that as a direct and proximate result of the unlawful employment practices of defendant Defendants Plaintiff incurred significant legal costs, back pay, front pay, compensatory damages, punitive damages, attorneys' fees,  emotional distress, and damage to his personal and professional reputation in an amount to be determined at trial.


**JURY TRIAL**

254.     Plaintiff demands a trial by jury of all issues in this action that are so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request that the Court:

a.  Award compensatory damages for the back pay, front pay, pain, suffering, Award compensatory damages for the back pay, front pay, pain, suffering, emotional distress, loss of dignity, humiliation, and damages to reputation and livelihood endured by Plaintiff  and all other damages afforded to Plaintiff by statute or otherwise in an amount to be determined at trial;

b.  Award Plaintiff punitive damages in an amount to be determined at trial;

c.  Award Plaintiff costs for this action and reasonably attorneys' fees, as provided for in 42 USC §1988 and 42 USC §2000e-5(k) and;

d.  Award Plaintiff punitive damages in an amount to be determined at trial New York City Human Rights Law Administrative Code §8-502(a);

e.  Find Defendants strictly liable pursuant to New York City Human Rights Law Administrative Code §8-107(13)(b);

f.   Award Plaintiff costs for this action and reasonably attorneys' fees, as provided for in New York City Human Rights Law Administrative Code §8-502 (f);

g.   All defendants herein are joint and severally liable for the actions of the any and all of the named Defendants herein;

h.   Grant Plaintiff such other and further relief as may be required in the interest of justice.

Dated: November 23, 2020

New York, NY

Respectfully submitted,

By:____/s/_____
    John Scola

Law Office of John A. Scola, PLLC
Attorneys for Plaintiff Emilio Tatis
30 Broad Street Suite 1424
New York, New York 10004
(917) 423-1445
jscola@johnscolalaw.com